Mary Ann L. Wymore (SBN: 126516)
**UB GREENSFELDER LLP**
10 S. Broadway, Suite 2000
St. Louis, MO 63102
Tel: (314) 516-2662/Fax: (314) 241-4245
mwymore@ubglaw.com

**Attorney for PLAINTIFF**
**A-LIST MARKETING SOLUTIONS, INC.**
**DBA PALISADE PROTECTION GROUP**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### AT SANTA ANA

| | |
|---|---|
| A-LIST MARKETING SOLUTIONS INC. dba PALISADE PROTECTION GROUP, <br><br> Plaintiff, <br><br> vs. <br><br> HEADSTART WARRANTY GROUP LLC AND MARIAM (ANGELA) NASRATI, <br><br> Defendants. | Case No. 8:25-cv-00131 <br><br> **FIRST AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

A-List Marketing Solutions Inc. dba Palisade Protection Group ("Plaintiff"), by and through counsel, respectfully states as follows for its First Amended Complaint against Headstart Warranty Group LLC ("Headstart") and Mariam (Angela) Nasrati ("Defendant Nasrati" or "Ms. Nasrati"), (collectively "Defendants"):

## NATURE OF THIS ACTION

1.      Plaintiff brings this action for tortious interference with business relations, unfair competition in violation of California law, misappropriation of trade secrets in violation of the California Uniform Trade Secrets Act, misappropriation of trade secrets in violation of the federal Defense of Trade Secrets Act, 18 U.S.C. § 1836, violation of California Penal Code § 502, violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, and for an equitable accounting arising from Defendants' deliberate and systemic misuse of Palisade's CRM system and the blatant theft, dissemination and use of Plaintiff's proprietary and trade secret information downloaded by Defendants from Plaintiff's CRM system without permission, authorization or justification.

## PARTIES

2.      Plaintiff is a corporation in good standing and incorporated under the laws of the State of California with its principal place of business located at 2923 Pullman Street, Suite A, Santa Ana, CA 92705.

3.      Defendant Headstart is a limited liability company organized under the laws of the State of Nevada with its principal place of business located at 14114 North Dallas Parkway, Suite 600, Dallas, Texas 75254.

4.      Upon information and belief, Defendant Nasrati is an individual who is a California citizen residing at 11010 Sweetwater Court, Chatsworth, California, 91311, in Los Angeles County.  At all relevant times, Ms. Nasrati was Defendant Headstart's sales agent assigned to Plaintiff.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of Seventy Five

Thousand and No/100 Dollars ($75,000.00), exclusive of interest and costs, and is between citizens of different states.

6.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this matter involves claims arising under the laws of the United States.

7.     This Court has jurisdiction over the state law claims included in this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims are part of the same case or controversy as those giving rise to this Court's jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 1331.

8.     This Court has personal jurisdiction over Defendant Headstart because the conduct giving rise to these claims occurred, at least in part, in this district, and because Headstart at all relevant times maintained a presence in the State of California and within this District through its agent, Defendant Nasrati.

9.     This Court has personal jurisdiction over Defendant Nasrati, who at all relevant times, resided and worked within this district and whose conduct giving rise to these claims occurred within this district.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and Plaintiff has suffered harm in this district.

## **FACTS COMMON TO ALL COUNTS**

11.     Plaintiff operates a call center, employing twenty (20) individuals, which markets and sells vehicle service contracts ("VSC(s)") of different administrators to consumers in jurisdictions across the United States.

12.     VSCs are not insurance, but rather service contracts that offer coverage for specific vehicle repairs over an agreed upon duration. The duration of coverage

varies, but is typically for several years.

13.    Defendant Headstart operates as a VSC administrator and contracts with various call centers, such as Plaintiff, to market and sell Headstart's product offerings.

14.    An administrator is responsible for carrying out the obligations specified in the VSC such as handling claims and authorizing the repairs identified in the VSC.

15.    It is commonplace in the VSC industry for call centers to market and sell product offerings of multiple administrators and for administrators to market and sell their product offerings through multiple call centers.

16.    The VSC industry is very competitive. Due to various federal and state law restrictions, the majority of marketing efforts directed to consumers are made via general advertisement channels of television, radio, internet, and mailings. Prospective customer response rates vary, but are generally low. Accordingly, information about prospective customers that respond to marketing efforts and contact a call center, as well as information about actual customers who acquire VSCs, is extremely valuable.

17.    Information collected about prospective and actual customers of a call center is considered in the VSC industry as confidential, proprietary, and a trade secret of the call center. Such information, along with its safe-keeping, is critical to the success (or failure) of a call center.

18.    The VSC industry is not only competitive, but financially perilous. In a typical VSC transaction, the majority of the cost of the VSC is prepaid in advance (facilitated through third-party finance companies) at or shortly thereafter the time the sale is made.

FIRST AMENDED COMPLAINT

19.    It is well-established in the VSC industry that a number of VSC customers will cancel their VSC coverage prior to expiration of the original term of the coverage. Under state laws, customers are entitled to a refund for the unused portion of the coverage. Accordingly, finance companies, administrators, and the obligors of administrators typically establish reserves to account for refund obligations.

20.    The reserves are established by setting aside a certain portion of the proceeds of each sale to account for such refund obligations. Finance companies, administrators, obligors, and even call centers regularly audit the volume, type, and methodology of sales being made by the call center to determine the appropriate amount of reserves to keep on hand.

21.    In the event that a call center experiences more contract cancellations than new sales, a call center's reserve account can be depleted and, upon exhaustion, the call center may even be forced into bankruptcy or close down. The call center may also have reimbursement obligations to the finance companies, administrators, and obligors should any of those parties be required to refund amounts to the call center's customers should the call center be unable to pay.

22.    Plaintiff and Defendant Headstart originally met in April of 2022 when a separate sales agent and Defendant Headstart's chief executive officer, Tim Schuur, visited Plaintiff's place of business in Orange County, California and solicited a business relationship. That initial relationship thereafter terminated in September 2022 amid concerns about Headstart's lack of history in the industry.

23.    In March of 2023, Defendant Nasrati, on behalf of Defendant Headstart, visited Plaintiff at Plaintiff's office in California and requested that Plaintiff again begin to market and sell various product offerings of Defendant.

FIRST AMENDED COMPLAINT

24.    Ms. Nasrati introduced herself as a sales representative of Defendant Headstart and represented to Plaintiff that she was responsible for Headstart's western client management / relationships.

25.    Ms. Nasrati communicated with Plaintiff through the email address angela@headstartwarrantygroup.com – an email address provided to Ms. Nasrati by Headstart to help bolster her credibility and credentials on behalf of Headstart.

26.    At all relevant times, Ms. Nasrati was an agent working for and on behalf of Defendant Headstart, and Headstart at all times had the right to substantially control Ms. Nasrati's activities on behalf of Headstart.

27.    Defendant Headstart asserts that Ms. Nasrati was not its employee, but rather an independent contractor of Headstart subject to a written contract, a copy of which is attached hereto as Exhibit A and incorporated as though fully set forth herein (the "Contract").

28.    The terms of the Contract make clear that at all times control over Ms. Nasrati's activities on behalf of Headstart was vested in Headstart, and that Headstart at all times substantially controlled the scope, manner and means of Ms. Nasrati's work for and on behalf of Headstart.

29.    For example, the Contract provides as follows:

a.    Headstart had the unilateral right to adjust the fees it would require.  (Contract, § 1.1.)

b.    Headstart determined where Ms. Nasrati was authorized to sell Headstart's products.  (Contract, § 2.)

c.    Headstart barred Ms. Nasrati from subcontracting her duties without Headstart's approval.  (Contract, § 2.)

FIRST AMENDED COMPLAINT

d.      Headstart had the right to force Ms. Nasrati to prepare reports regarding her sales activities.  (Contract, §§ 3.1; 3.3; 5.9; and 13.9.)

e.      Headstart delegated some of its duties under EFT Law to Ms. Nasrati.  (Contract, § 3.3.)

f.      Headstart specified the format for reports due by Ms. Nasrati to Headstart, and specified how certain records should be maintained.  (Contract, §§ 3.4; and 3.5.)

g.      Headstart had the right to dictate terms and procedures for how Ms. Nasrati marketed contracts.  (Contract, § 4.1.)

h.      Ms. Nasrati generally agreed to act on Headstart's behalf in the manner and means determined or instructed by Headstart.  (Contract, § 4.1.)

i.      Headstart had the right to oversee/verify Ms. Nasrati's compliance. (Contract, §§ 5.8, and 5.9.)

j.      Ms. Nasrati was required to submit all marketing and advertising to Headstart for review and approval.  (Contract, §§ 6.1; 6.3; 6.4; 6.5; and 9.10.)

k.      Ms. Nasrati was limited to distributing only approved materials and only in certain authorized areas.  (Contract, § 9.1.)

l.      Ms. Nasrati was required to report any complaint or legal action against Ms. Nasrati to Headstart.  (Contract, § 9.5.)

m.      Ms. Nasrati was required to issue contracts only in accordance with Headstart's guidelines.  (Contract, §§ 9.8; and 9.9.)

n.      Headstart had the right to remove funds from a custodial account of Ms. Nasrati without Ms. Nasrati's permission.  (Contract, § 12.4.)

30.      At the time of Ms. Nasrati's March 2023 visit to Plaintiff's California

FIRST AMENDED COMPLAINT

office, Plaintiff was skeptical about the relationship as Defendant Headstart was a relatively new administrator in the industry.  In response, Ms. Nasrati made various financial promises to Plaintiff on behalf of Headstart to induce Plaintiff to agree to market and sell Defendant Headstart's  product offerings again, which Plaintiff accepted.

31.    Over the course of the next few months, Ms. Nasrati aggressively solicited business from Plaintiff and made repeated, unannounced visits to Plaintiff's place of business in California for the purpose of soliciting Plaintiff's business.

32.    In June of 2023 Headstart's chief executive officer, Tim Schuur, made another trip to Plaintiff's business in Orange County, California to solicit Plaintiff's business. This time, Mr. Schuur was accompanied by Ms. Nasrati and Headstart's chief financial officer, Dan Haug. Plaintiff understood this visit to constitute an interview to determine whether Headstart would offer Plaintiff financial incentives to help close on Headstart's business solicitations of Plaintiff.

33.    During the June 2023 visit, Mr. Schuur and Mr. Haug never advised Plaintiff of any limitations of or upon Ms. Nasrati to act on behalf of Headstart and instead supported Ms. Nasrati's solicitation and marketing efforts to Plaintiff.

34.    As a result, Headstart's sustained, in-person solicitation efforts of Plaintiff at Plaintiff's business in California prevailed and Plaintiff re-entered into a business relationship with Headstart in June 2023.

35.    Plaintiff utilizes customer relationship management software ("CRM") offered by Moxie to organize and manage all information about Plaintiff's prospective and actual customers, including, but not limited to customer contact information, communications with customers, sales pitches, and sale information, if applicable, including the type of contract sold, coverage details, and sale price. The

information contained on Plaintiff's CRM took considerable time, effort, and resources to assemble and is considered by Plaintiff to be confidential, proprietary, and a trade secret of Plaintiff. The information contained in Plaintiff's CRM is the single most important asset of Plaintiff's business and is closely safeguarded from public view.

36.    In September of 2023, Ms. Nasrati notified Plaintiff that she needed access to Plaintiff's CRM for the sole purpose of tracking Plaintiff's sales data.

37.    Direct access to a call center's CRM by an administrator is not uncommon and can assist administrators and call centers in communicating sensitive data to one another concerning the call center's leads, sales, and refund obligations. This information allows the call center and administrator to ensure state and federal law compliance as well as assist with establishing appropriate reserve amounts. Direct access also allows for immediate information retrieval rather than waiting on monthly or other periodic reports between the call center and administrator.

38.    Again, Ms. Nasrati advised that the sole purpose of requesting login access was to help track Plaintiff's sales data. That sales data included Plaintiff's attempted and actual sales of product offerings of *both* Defendant and competitor administrators.

39.    On September 12, 2023, Defendant Nasrati requested the login credentials of and to Plaintiff's CRM and Plaintiff provided such login credentials to Ms. Nasrati on the same date.

40.    Almost immediately, Moxie notified Defendant Headstart that Ms. Nasrati had obtained access to Plaintiff's CRM system. Defendant Headstart had the opportunity to terminate such access, but instead instructed Moxie to continue to permit Ms. Nasrati access to Plaintiff's CRM system.

FIRST AMENDED COMPLAINT

41.    Defendant Headstart never expressed any concern about Ms. Nasrati's access to Plaintiff's CRM to Plaintiff.

42.    On information and belief, Headstart never expressed any concern to Ms. Nasrati nor told Ms. Nasrati not to access Plaintiff's CRM system.

43.    Upon information and belief, Ms. Nasrati's access to Plaintiff's CRM system was or was perceived to be financially favorable to Headstart.

44.    Plaintiff's investigation is ongoing and continuing, but to date, it appears Defendants, through Ms. Nasrati, downloaded confidential and proprietary information about Plaintiff's customers on at least seventy-two (72) occasions starting on October 10, 2023. The immediate and systemic downloading of Plaintiff's customer records was never authorized by Plaintiff. Plaintiff was unaware that Ms. Nasrati was engaging in such conduct at the time the same occurred.

45.    Upon information and belief, the CRM information and trade secrets were downloaded by Defendant Nasrati in California from Moxie's CRM system located on servers in California, and was then delivered to Plaintiff's competitor located in Santa Ana, California.

46.    Shortly after Ms. Nasrati began downloading Plaintiff's customer records, in January of 2024, the main finance company servicing Plaintiff's customers contacted Plaintiff and advised that it would be increasing Plaintiff's refund (loss) reserve requirements as it began tracking an increasing spike of contract cancellations by Plaintiff's customers.

47.    In March of 2024, that same finance company increased Plaintiff's loss reserve requirements again. By that time and unbeknown to Plaintiff, Ms. Nasrati had downloaded customer information from Plaintiff's CRM on more than fifty-two (52) occasions.

FIRST AMENDED COMPLAINT

48.     Despite being managed by an industry veteran, Plaintiff continued to experience aberrational heightened cancellation rates through November of 2024.

49.     Plaintiff discovered why on November 19, 2024.

50.     On that date, an upstart competitor call center located in Santa Ana, California, contacted Plaintiff to advise that in July of 2024, Ms. Nasrati had provided it with lists of customer names, addresses, telephone numbers, and vehicle data along with sale dates and information on the types of contracts such customer had obtained. Stated differently, Defendant Headstart's agent provided the upstart call center with information reflecting previously sold contracts of another call center.

51.     Upon information and belief, the upstart competitor advised Plaintiff that Ms. Nasrati specifically instructed the upstart competitor to market new VSCs offered by Headstart to the customers identified on this list. The process is known as re-writing a contract and occurs when a customer is convinced to cancel current VSC coverage in favor of a new VSC being offered – typically a competitor's product.

52.     As the upstart competitor began marketing to the lead list it was provided, one of the customers identified in such list advised the upstart competitor that said customer had previously purchased a contract with a competitor call center. The upstart competitor investigated that comment and determined the competitor call center was Plaintiff.

53.     The upstart competitor began sending photographs (via text message) of the records it received from Headstart's agent, Ms. Nasrati, to Plaintiff. Plaintiff promptly compared those records with the information in Plaintiff's CRM and confirmed that every single customer identified on the lead list provided to the upstart competitor was a current customer of Plaintiff.

FIRST AMENDED COMPLAINT

54.     Indeed, Plaintiff discovered that the lead list provided by Ms. Nasrati to the upstart competitor was an identical match to the information maintained in Plaintiff's CRM, including typographical errors and missing inputs.

55.     Plaintiff's investigation is ongoing and continuing, but it appears that the lead list provided by Ms. Nasrati for Headstart's benefit to the upstart competitor contained only customer and sales information of Plaintiff's customers that had been sold other administrator product offerings.

56.     Stated differently, Defendant Nasrati, after having obtained access to Plaintiff's CRM through false pretenses, on behalf of Defendant Headstart systemically and surreptitiously downloaded information about Plaintiff's sales of other administrator's product offerings by Plaintiff and then transmitted that information to at least one competitor of Plaintiff in California with the express instruction of marketing Headstart's product offerings to said customers.

57.     Since Defendants' activities have come to light, Defendant Nasrati has visited the upstart competitor's offices (in Santa Ana, California) for the purpose of intimidating the competitor witness into recanting the competitor's statements.

58.     During Defendants' surreptitious campaign described above, Plaintiff continued to market and sell Defendant Headstart's product offerings.

59.     Plaintiff suffered unusually high cancellation rates, lost sales and profits, and unfavorable loss reserve requirements as a direct and proximate result of Defendants' conduct. The cancellation rates and losses affected sales of competitor administrator product offerings at higher rates than those sales of Defendant Headstart's product offerings.

60.     Plaintiff's investigation is ongoing and continuing, but Plaintiff reasonably believes more than seven thousand (7,000) records were accessed,

downloaded, and disclosed by Defendant Nasrati on behalf of Defendant Headstart.

61.    Upon information and belief, Defendants disseminated Plaintiff's confidential and proprietary information along with Plaintiff's trade secrets to other competitor call centers.

62.    Plaintiff suffered damages as a direct and proximate result of Defendant's conduct in an amount exceeding Seventy-Five Thousand and No/100 Dollars ($75,000.00).

63.    Meanwhile, upon information and belief, Defendants enjoyed substantial profits as a result of their unlawful conduct in the form of new contracts sold by Plaintiff's competitors using Plaintiff's confidential and propriety information, along with Plaintiff's trade secrets.

64.    Defendants' conduct has caused Plaintiff's employees, Defendant Headstart's competitors, finance companies servicing Plaintiff, and other vendors additional and substantial damages.

## COUNT I

### Tortious Interference with Business Relations

65.    Plaintiff incorporates by reference herein each of the allegations set forth in Paragraphs 1 through 64 of this Complaint.

66.    Plaintiff enjoyed a valid contractual relationship with each of the customers located in Plaintiff's CRM, with the probability of future economic benefit to the Plaintiff. Each of the subject customers had already obtained a contract from Plaintiff and had either paid or agreed to pay Plaintiff for the cost of such contract.

67.    Defendants had knowledge of such contractual relationships by virtue of Defendants' access to Plaintiff's CRM and ability to view what products

(including competitor administrator products) had been sold to Plaintiff's customers.

68.    Upon information and belief, and without permission from or notice to Plaintiff, Defendants intentionally and systematically misappropriated confidential and propriety information and trade secrets of Plaintiff relating to Plaintiff's sales of competitor product offerings and then transmitted such information and trade secrets to at least one competitor of Plaintiff with the express instruction to market Defendant Headstart's product offerings to Plaintiff's customers. Defendant's conduct was designed to induce a breach of the contracts then existing between Plaintiff and its customers.

69.    Defendants' conduct induced disruptions in the contractual relationships between Plaintiff and its customers, resulting in hundreds of cancellations of previously-sold contracts by Plaintiff.

70.    Plaintiff has suffered direct and proximate damages, in an amount to be proven at trial, as a result of Defendants' conduct, including, lost sales and profits, unusually high cancellation rates, and unfavorable loss reserve requirements.

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendants, jointly and severally, in an amount to be proven at trial that will fairly and justly compensate it for Defendants' conduct, for punitive damages to redress Defendants' conduct, for Plaintiff's expenses and costs in bringing this action, and such other and further relief as the Court deems just and appropriate under the circumstances.

## COUNT II

### Unfair Competition in Violation of California Unfair Competition Law

71.    Plaintiff incorporates by reference herein each of the allegations set forth in Paragraphs 1 through 70 of this Complaint.

72.     Upon information and belief, Defendants utilized false pretenses to gain access to Plaintiff's CRM and systematically and surreptitiously misappropriated Plaintiff's confidential and propriety information, along with Plaintiff's trade secrets, and transmitted them to competitors of Plaintiff for the express purpose of attempting to re-write Plaintiff's previously sold contracts of Defendant Headstart's competitor product offerings with new contracts selling Defendant Headstart's product offerings.

73.     Defendants' unlawful conduct was not authorized by Plaintiff and resulted in unfair competition between Plaintiff, Plaintiff's competitors, and Defendant Headstart.

74.     Plaintiff has suffered direct and proximate damages, in an amount to be proven at trial, as a result of Defendants' conduct, including, lost sales and profits, unusually high cancellation rates, and unfavorable loss reserve requirements.

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendants, jointly and severally, in an amount to be proven at trial that will fairly and justly compensate it for Defendants' conduct, for punitive damages to redress Defendants' conduct, for Plaintiff's expenses and costs in bringing this action, and such other and further relief as the Court deems just and appropriate under the circumstances.

## COUNT III

### Misappropriation of Trade Secrets in Violation of California Uniform Trade Secrets Act

75.     Plaintiff incorporates by reference herein each of the allegations set forth in Paragraphs 1 through 74 of this Complaint.

76.     Plaintiff owned and owns a trade secret, namely the confidential and

FIRST AMENDED COMPLAINT

proprietary information contained in Plaintiff's CRM. Specifically, all information pertaining to Plaintiff's prospective and actual customers, such customer's sales proclivities, tendencies, communications, and ultimate actions, including purchases of certain product offerings, is contained within Plaintiff's CRM.

77.    Through false pretenses, Defendants gained access to Plaintiff's CRM and systematically and surreptitiously downloaded information from Plaintiff's CRM about Plaintiff's customers on no less than seventy-two (72) occasions.

78.    Upon information and belief, without consent of Plaintiff, Defendants then transmitted information about Plaintiff's customers, including sales history, to Plaintiff's competitor with the express instruction that said competitor should market and sell Defendant Headstart's product offerings to customers of Plaintiff that had been sold product offerings of competitors of Defendant Headstart.

79.    Plaintiff has suffered direct and proximate damages, in an amount to be proven at trial, as a result of Defendants' conduct, including, lost sales and profits, unusually high cancellation rates, and unfavorable loss reserve requirements.

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendants, jointly and severally, in an amount to be proven at trial that will fairly and justly compensate it for Defendants' conduct, for punitive damages to redress Defendants' conduct, for Plaintiff's expenses and costs in bringing this action, and such other and further relief as the Court deems just and appropriate under the circumstances.

## COUNT IV

**Misappropriation of Trade Secrets in Violation of Defense of Trade Secrets Act 18 USC § 1836**

80.    Plaintiff incorporates by reference herein each of the allegations set

forth in Paragraphs 1 through 79 of this Complaint.

81.    Plaintiff owned and owns a trade secret, namely the confidential and proprietary information contained in Plaintiff's CRM. Specifically, all information pertaining to Plaintiff's prospective and actual customers, such customer's sales proclivities, tendencies, communications, and ultimate actions, including purchases of certain product offerings, is contained within Plaintiff's CRM.

82.    Through false pretenses, Defendants gained access to Plaintiff's CRM and systematically and surreptitiously downloaded information from Plaintiff's CRM about Plaintiff's customers on no less than seventy-two (72) occasions.

83.    Upon information and belief, without consent of Plaintiff, Defendants then transmitted information about Plaintiff's customers, including sales history, to Plaintiff's competitor with the express instruction that said competitor should market and sell Defendant Headstart's product offerings to customers of Plaintiff that had been sold product offerings of competitors of Defendant Headstart.

84.    Plaintiff has suffered direct and proximate damages, in an amount to be proven at trial, as a result of Defendants' conduct, including, lost sales and profits, unusually high cancellation rates, and unfavorable loss reserve requirements.

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendants, jointly and severally, in an amount to be proven at trial that will fairly and justly compensate it for Defendants' conduct, for punitive damages to redress Defendants' conduct, for Plaintiff's expenses and costs in bringing this action, and such other and further relief as the Court deems just and appropriate under the circumstances.

FIRST AMENDED COMPLAINT

## COUNT V

### Violation of California Penal Code §502

85.    Plaintiff incorporates by reference herein each of the allegations set forth in Paragraphs 1 through 84 of this Complaint.

86.    Defendants obtained access to Plaintiff's CRM through false pretenses and downloaded, without Plaintiff's permission or knowledge, Plaintiff's confidential and proprietary information, along with Plaintiff's trade secrets. Defendants' conduct of downloading Plaintiff's confidential and proprietary information, along with Plaintiff's trade secrets, for the purpose of disseminating the same to Plaintiff's competitors exceeded the original, limited authority to access Plaintiff's CRM to monitor sales data.

87.    Plaintiff's investigation into the nature and use of the information downloaded is ongoing and continuing; however, Plaintiff has suffered damages to be proven at trial associated with the investigation into Defendants' conduct.

88.    Plaintiff has suffered reasonable attorney's fees as a result of Defendants' conduct.

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendants, jointly and severally, in an amount to be proven at trial that will fairly and justly compensate it for Defendants' conduct, for punitive damages to redress Defendants' conduct, for Plaintiff's expenses and costs and reasonable attorney's fees in bringing this action, and such other and further relief as the Court deems just and appropriate under the circumstances.

## COUNT VI

### Violation of Computer Fraud and Abuse Act 18 U.S.C. § 1030 et seq.

89.    Plaintiff incorporates by reference herein each of the allegations set

FIRST AMENDED COMPLAINT

forth in Paragraphs 1 through 88 of this Complaint.

90.     Defendants obtained access to Plaintiff's CRM through false pretenses and downloaded, without permission or knowledge of Plaintiff, Plaintiff's confidential and proprietary information, along with Plaintiff's trade secrets. Defendants' conduct of downloading Plaintiff's confidential and proprietary information, along with trade secrets, for the purpose of disseminating the same to Plaintiff's competitors exceeded the original, limited authority to access Plaintiff's CRM to monitor sales data.

91.     Plaintiff's CRM, computers, and computer systems, and Defendants' access to such CRM, computers and computer systems all affect interstate commerce.

92.     Plaintiff's investigation into the nature and use of the information downloaded is ongoing and continuing; however, Plaintiff has suffered damages to be proven at trial associated with the investigation into Defendants' conduct.

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendants, jointly and severally, in an amount to be proven at trial that will fairly and justly compensate it for Defendants' conduct, for punitive damages to redress Defendants' conduct, for Plaintiff's expenses and costs and reasonable attorney's fees in bringing this action, and for such other and further relief as the Court deems just and appropriate under the circumstances.

## COUNT VII

### Equitable Accounting

93.     Plaintiff incorporates by reference herein each of the allegations set forth in Paragraphs 1 through 92 of this Complaint.

94.     Plaintiff's investigation is ongoing and continuing, but Plaintiff has

been able to verify more than seventy-two (72) distinct downloads by Defendants of Plaintiff's CRM.

95.    It remains unclear and unknown exactly what Defendants did with the results of the information downloaded without Plaintiff's consent.

96.    Plaintiff was apprised that Defendants transmitted some of Plaintiff's confidential and proprietary information, along with its trade secrets, to a competitor of Plaintiff, but believes additional dissemination to third-parties occurred.

97.    The full nature and scope of the unauthorized downloads and disseminations requires an accounting to enable Plaintiff to learn the full scope of Defendant's conduct as well as resulting damages.

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendants, jointly and severally, ordering Defendants each to provide a full accounting of everything Defendants downloaded and/or took from Plaintiff's CRM, what Defendants' did with that information, and what sales were generated from Plaintiff's competitors who were provided such information, and for Plaintiff's expenses and costs in bringing this action, and such other and further relief as the Court deems just and appropriate under the circumstances.


Dated:  June 5, 2025                           Respectfully submitted,

                                               **UB GREENSFELDER LLP**

                                               By:  */s/ Mary Ann Wymore*
                                               Mary Ann L. Wymore, #126516
                                               10 South Broadway, Suite 2000
                                               St. Louis, Missouri 63102
                                               (314) 241-9090
                                               mwymore@ubglaw.com

                                               *Attorney for Plaintiff*

FIRST AMENDED COMPLAINT

1

<u>Demand for Trial by Jury</u>

2

3     Plaintiff hereby demands a trial by jury.

4

5     Dated:  June  5, 2025                    Respectfully submitted,

6                                             **UB GREENSFELDER LLP**

7                                             By:  <u>*/s/ Mary Ann L. Wymore*</u>
                                              Mary Ann L. Wymore, # 126516
8                                             10 South Broadway, Suite 2000
                                              St. Louis, Missouri 63102
9                                             (314) 241-9090
                                              mwymore@ubglaw.com
10

11                                            *Attorney for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FIRST AMENDED COMPLAINT